IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| CATHRYN ELAINE HARRIS, MARIO HERRERA, and MARYAM HOSSEINY on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br><br>v.<br><br>BLOCKBUSTER, INC.<br>Defendant. | CAUSE NO. 2:08-CV-00155-DF<br><br>JUDGE: T. JOHN WARD<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT – CLASS ACTION**<br>**JURY TRIAL DEMAND** |

## PLAINTIFFS' FIRST AMENDED COMPLAINT – CLASS ACTION

Plaintiffs, Cathryn Elaine Harris, Mario Herrera, AND Maryam Hosseiny on behalf of themselves and all others similarly situated, sues Defendant, BLOCKBUSTER, INC. and states:

1. This is a class action pursuant to the Video Privacy Protection Act, 18 U.S.C. §2710. (the "VPPA" or "the Act"). Plaintiffs bring this action on their own behalf and on behalf of all similarly situated individuals whose "personally identifiable information" was knowingly disclosed to third parties by Defendant in violation of the Act.

## I.

## PARTIES

2. Plaintiff CATHRYN ELAINE HARRIS is a resident of Dallas County, Texas and registered user of Blockbuster Online and Facebook. During all times relevant Plaintiff's "personal identifiable information" was transmitted to Facebook from Blockbuster Inc.'s online website.

3. Plaintiff, MARRIO HERRERA, is a resident of Dallas County, Texas and registered user of Blockbuster Online and Facebook. During all times relevant Plaintiff's

"personal identifiable information" was transmitted to Facebook from Blockbuster Inc.'s online website.

4.  Plaintiff, MARYAM HOSSEINY, is a resident of Dallas County, Texas and registered user of Blockbuster Online and Facebook. During all times relevant Plaintiff's "personal identifiable information" was transmitted to Facebook from Blockbuster Inc.'s online website.

5.  Defendant BLOCKBUSTER, INC. is a Delaware corporation with its principal place of business at PO Box 8019 McKinney, Collin County, Texas 75070-8019, and which, at all times material to this action, has been doing business in this District and throughout the State of Texas. Defendant may be served with process through its registered agent, Corporation Service Company, 701 Brazos Street, Suite 1050, Austin, Texas 78701

## II.

## JURISDICTION AND VENUE

6.  This action arises under a federal statute and this Court has jurisdiction pursuant to 18 U.S.C. §2710(c) (conferring jurisdiction on the United States District Court for actions under the VPPA) and 28 U.S.C. §1331 (federal question jurisdiction).

7.  Venue is appropriate in this District because members of the proposed class, are a residents of the District and Defendant has committed violations of the VPPA within the Eastern District of Texas.

# III.

# FACTS APPLICABLE TO ALL COUNTS

## A. THE ENACTMENT OF THE VIDEO PRIVACY PROTECTION ACT

8. Congress enacted the Videotape Privacy Protection Act "to protect [certain personal information of an individual who rents video materials] from disclosure." S.Rep. No. 100-599, 100th Cong., 2d Sess. at 16 (1988). The impetus for enacting the measure arose as a result of Judge Robert Bork's 1987 Supreme Court nomination battle, during which a Washington, D.C. newspaper obtained a list of 146 video tapes the Bork family had previously rented from their neighborhood store. Members of the Senate Judiciary Committee were outraged by the invasion into the Bork family's privacy. Both houses of Congress acted quickly to outlaw certain disclosures of such clearly private information, resulting in the Videotape Privacy Protection Act. Senator Leahy echoed the nation's desire to protect individual's privacy rights when he commented on the act by saying,

> "[Privacy] is not a conservative or liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone."

S. Rep. No. 100-599, 100th Cong., 2 Sess. At 6 (1988).

9. Section 2710(c) of the Act provides broadly that "[a]ny person aggrieved by any act of a person in violation of [§ 2710] may bring a civil action" in an appropriate U.S. District Court. The Act can be violated in one or all of the following three ways: (1) a "video tape service provider" discloses 'personally identifiable information' regarding a customer without meeting any of the enumerated exceptions listed in the act, (2) if personally identifiable information obtained in any manner other than as narrowly provided by the Act is "received in evidence" in almost any adversarial proceeding, and (3) a "person" fails to timely destroy a

customer's personally identifiable information. 18 U.S.C. § 2710(e). Upon finding any of these violations, a plaintiff is entitled to a range of relief including actual damages, statutory damages, punitive damages, attorneys' fees, or "such other ... equitable relief as the Court may determine to be appropriate." 18 U.S.C. § 2710(c).

**B.  FACEBOOK**

10.  Facebook is owned and operated by a privately held company named, Facebook, Inc. The website was created by Harvard University graduate, Mark Zuckerberg while a student attending the University in 2004. Originally, the website was established to allow Harvard University students to communicate with each other on the Facebook network. However, the website quickly became a medium for anyone aged 13 and over.

11.  Facebook now has more than 64 million active users worldwide. From September 2006, to September 2007, the website rose in ranking among all websites, in terms of traffic, from 60th to 7th. Facebook is also the most popular website for uploading photos, with 14 million uploaded daily.

12.  The free-access website allows users to join one or more networks, such as a school, place of employment, or geographic region to easily communicate with other users joined to the same network. Facebook was named after the paper facebooks depicting members of a campus community that some American colleges and preparatory schools give to incoming students, faculty, and staff as a way to get to know other people on campus.

13.  On November 6, 2007, Facebook announced to the public that 44 websites would work hand-in-hand with Facebook and its new Facebook Beacon system. One of these 44 websites was www.blockbuster.com a Blockbuster, Inc. owned website.

## C. THE BEACON SYSTEM

14. Beacon was created to provide members of Facebook a new way to socially distribute information on the website. Facebook implemented the new computer program as a core element in the Facebook Ads system for connecting businesses with users.

15. The way Beacon functions is third-party sites that affiliate with Beacon are given javascript code (herein referred to as "tag") to place on its website pages. Once an individual goes to the third-party's page and performs certain actions (such as renting a movie) the tag "calls" Facebook programming software. An iframe is generated and the information is loaded into Facebook software. At this point, Facebook knows about the news feed item whether an individual has chosen to publish that information or not. Next, Facebook programming software sends the information back to the third-party website and creates a pop-up that displays on the bottom right corner of your computer screen window stating that the website (such as blockbuster) is sending a summary of your action to your Facebook profile. The summary reads something like this, "Preston added Lord of the Rings to his queue on Blockbuster.com." Listed below the summary is "Learn More/This isn't me" and "x no thanks." The "x no thanks" is the only option that is presented to a user in order to enable him/her to opt-out of blockbuster sending that summary to Facebook friends.

16. Essentially, websites that have implanted the Beacon system can distribute summary information collected from a users actions that she/he performed on the companies website to Facebook. These actions include the distribution of video rental information, video game rental information, what movies individuals are going to see in movie theaters, etc.

### D. PUBLIC OUTCRY AND APOLOGY

17. Many members of Facebook began to complain about the new Beacon system and even claimed that they never saw the "opt-out" option (which was the pop-up window that was supposed to show up at the bottom right-hand of your computer screen). After much public outcry and criticism for collecting more information on users for advertisers than was previously stated of the new Beacon system, on December 5, 2007, Mark Zuckerberg publicly apologized for the way that Facebook launched the Beacon system, saying "the problem with our initial approach of making it an opt-out system instead of opt-in was that if someone forgot to decline to share something, Beacon still went ahead and shared it with their friends."

18. In addition, Mark Zuckerberg, stated:

> About a month ago, we released a new feature called Beacon to try to help people share information with their friends about things they do on the web. We've made a lot of mistakes building this feature, but we've made even more with how we've handled them. We simply did a bad job with this release, and I apologize for it. While I am disappointed with our mistakes, we appreciate all the feedback we have received from our users. I'd like to discuss what we have learned and how we have improved Beacon.
>
> When we first thought of Beacon, our goal was to build a simple product to let people share information across sites with their friends. It had to be lightweight so it wouldn't get in people's way as they browsed the web, but also clear enough so people would be able to easily control what they shared. We were excited about Beacon because we believe a lot of information people want to share isn't on Facebook, and if we found the right balance, Beacon would give people an easy and controlled way to share more of that information with their friends.
>
> But we missed the right balance. At first we tried to make it very lightweight so people wouldn't have to touch it for it to work. The problem with our initial approach of making it an opt-out system instead of opt-in was that if someone forgot to decline to share something, Beacon still went ahead and shared it with their friends. It took us too long after people started contacting us to change the product so that users had to explicitly approve what they wanted to

> share. Instead of acting quickly, we took too long to decide on the right solution. I'm not proud of the way we've handled this situation and I know we can do better.
>
> Facebook has succeeded so far in part because it gives people control over what and how they share information. This is what makes Facebook a good utility, and in order to be a good feature, Beacon also needs to do the same. People need to be able to explicitly choose what they share, and they need to be able to turn Beacon off completely if they don't want to use it.
>
> This has been the philosophy behind our recent changes. Last week we changed Beacon to be an opt-in system, and today we're releasing a privacy control to turn off Beacon completely. You can find it here. If you select that you don't want to share some Beacon actions or if you turn off Beacon, then Facebook won't store those actions even when partners send them to Facebook.
>
> On behalf of everyone working at Facebook, I want to thank you for your feedback on Beacon over the past several weeks and hope that this new privacy control addresses any remaining issues we've heard about from you.
>
> Thanks for taking the time to read this.

19. On or about November 29, 2007, Facebook changed their opt-out system to an opt-in system where users of Facebook would have to give their express consent to send the beacon summaries to friends.

20. To this day; however, Facebook still receives personal identifiable information from participating websites with the Beacon javascript, whether the Facebook member has chosen to distribute their information or not.

E. **BLOCKBUSTER ALIGNS WITH FACEBOOK TO SHARE "PERSONALLY IDENTIFIABLE INFORMATION"**

21. Facebook aligned with 12 major U.S. Corporations in 2007, including Blockbuster in order to share information collected by the movie giant with Facebook to create a new advertisement medium.

22. Jim Keyes, Blockbuster's Chief Executive Officer, commented on the new Beacon system, "this is beyond creating advertising impressions. This is about Blockbuster participating in the community of the consumer so that, in return, consumers feel motivated to share the benefits of our brand with their friends."

23. Blockbuster participated in the community of the consumer by placing the Beacon tag on their website to gather and distribute personally identifiable information about a consumer every time the individual performs an action, such as renting or buying a movie, or placing movie selections into the user's queue.

24. Every time Beacon gathers the personal identifiable information the information is sent to Facebook. Blockbuster shares information collected by the Beacon tag to Facebook and then to Facebook users. The information that the tag collects is information such as the specific movie an individual rents, movie purchases made and even movies that users place in their queues on the Blockbuster website.

25. In early November of 2007, Blockbuster first implemented the Beacon tag. At this time, a member of Blockbuster who was either renting, buying or placing a movie into their queue (which is a way to store a number of movies for future rental) was prompted with a summary of their action that the tag gathered on the bottom right-hand corner of the member's screen telling the member that the information collected from the Beacon tag would be sent in a summary form to the user's Facebook friends. Users of the Blockbuster's website were given an opportunity to prevent friends from seeing the information from a "x no thanks" box that appeared at the bottom of the summary; however, if users did not quickly respond, the popup went away . . . and a "yes" was sent to Facebook who then distributed the information to your friends. For example, if someone buys a movie from Blockbuster online, and does not choose to

opt-out in time, the consumer's selection on Blockbuster (such as the name of the movie rented by that consumer) was placed in the consumer's news feed on their Facebook profile and in their friends' news feeds. Along with the story was a picture of the individual who purchased the movie and a Blockbuster ad.

26. Sometime in December 2007, Blockbuster began notifying online users that a summary of the user's actions would be sent to Facebook. However, the summary is immediately sent to a user's Facebook profile even before the user has a chance to decline the distribution of his/her personal identifiable information (as long as you have not marked the privacy feature telling blockbuster never to send summaries). To this day, Blockbuster online members remain unsuspecting victims.

27. Blockbuster remains as a distributor of personally identifiable information.

F. **CAUSES OF ACTION**

I. **Video Tape Rental and Sale Records, VPPA 18 U.S.C. §2710(b)**

28. Defendant violated §2710(b) of the Video Privacy Protection Act when Defendant knowingly distributed Plaintiffs' and class members' video tape rental and sale records to third parties who did not have the informed, written consent of Plaintiffs or class members at the time of the disclosure.

29. Defendant is a "video tape service provider[s]" within the meaning of the VPPA 18 U.S.C. §2710 because Defendant is a "person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." Blockbuster Online is a website where consumers can log in and rent, purchase or add movies to a queue for later rental. Blockbuster's online website is one of the nation's largest online companies for rental, sale and delivery of audiovisual materials. In

fact, Blockbuster has 1.6 million consumers joined to their Blockbuster on-line rental service. Blockbuster is clearly a "video tape service provider."

30. Defendant's violations of the VPPA have been committed "knowingly," within the meaning of the VPPA 18 U.S.C. §2710. In the context of the VPPA, to act knowingly is to act with knowledge of the facts that constitute the offense. *See, e.g., Bryan v. Unites States,* 524 U.S. 184, 193, 118 S.Ct. 1939, 1946, (1998) ("[U]nless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense."). Defendant knew that it distributed Plaintiffs' and class members' personal identifiable information when Defendant placed Beacon javascript code on its webpage to copy each action Plaintiffs and class members made on the Defendant's webpage and subsequently sent that information to third parties including Facebook. Defendant's acts of copying Plaintiffs' and class members' video selections and distributing them to a Facebook was how Defendant planned on participating in the consumer's community. Defendant clearly knows that Plaintiffs' and class members' personally identifiable information was and currently is still being distributed to Facebook because Defendant's website pop-up screen tells Plaintiffs and class members that their information is being sent to Facebook every time Plaintiffs and class members rent, purchase or adds a movie to their queue.

31. The information Defendant is obtaining from their website constitutes "personal identifiable information" within the meaning of the VPPA, 18 U.S.C. §2710. Defendant's distributed Plaintiffs and class members information such as movie purchases, rentals and queue selections that Plaintiffs and class members made to Facebook. Each occurrence where Defendant's knowingly distributed a consumer's personal identifiable information to a third

party is a separate and distinct violation of the VPPA, remediable under the VPPA, 18 U.S.C. §2710.

## IV.

## CLASS ACTION ALLEGATIONS

32. Pursuant to Fed. R. Civ. P. 23(b)(3), and 23(b)(2) Plaintiffs bring this action on behalf of themselves, and all others similarly situated, as representatives of the following class (the "Class"):

> Each and every individual in the United States of America who has ever been a member of Facebook and Blockbuster on-line during the same time period beginning from November 6, 2007, through the date of judgment herein whose name, and/or address, or a title, description, or subject matter of any video tapes or other audio visual materials that were rented, sold or delivered to each individual were distributed to third parties by Defendant without the informed written consent of such individuals obtained at the time the disclosure was made.

> Excluded from the class are all employees, including, but not limited to, Judges, Magistrate Judges, clerks and court staff and personnel of the United States District Courts of the Eastern District of Texas, the United States Court of Appeals for the Fifth Circuit and the United States Supreme Court; their spouses and any minor children living in their households and other persons within a third degree of relationship to any such Federal Judge; and finally, the entire jury venire called to for jury service in relation to this lawsuit.

33. The requirements of Fed. R. Civ. P. 23 are met in this case. The Class, as defined, is so numerous that joinder of all members is impracticable.

34. There are questions of fact and law common to the Class as defined, which common questions predominate over any questions affecting only individual members. The common questions include:

a. whether Defendants improperly distributed and/or used "personal identifiable information" obtained from their websites of members of the Class, within the meaning of the VPPA, 18 U.S.C. §2710, and,

b. whether Defendants' obtaining and distributing "personal identifiable information" from the Defendants' websites of members of the Class was done knowingly, within the meaning of the VPPA, 18 U.S.C. §2710.

c. whether Defendants' obtaining and distribution of "personal identifiable information" from the Defendants' websites of members of the Class was destroyed "as soon as practicable, but no[t] later than one year from the date the information is no longer necessary for the purpose for which it was collected," within the meaning of the VPPA, 18 U.S.C. §2710.

35. Plaintiffs can and will fairly and adequately represent and protect the interests of the Class as defined and have no interests that conflict with the interests of the Class. This is so because:

a. All of the questions of law and fact regarding the liability of the Defendants are common to the class and predominate over any individual issues that may exist, such that by prevailing on their own claims, Plaintiffs will necessarily establish the liability of the Defendants to all class members;

b. Without the representation provided by Plaintiffs, it is unlikely that any class members would receive legal representation to obtain the remedies specified by the VPPA;

c. A remedy available under the VPPA is the liquidated sum of $2,500, which Plaintiffs intend to seek for all members of the Class; and

d. Plaintiffs have retained competent attorneys who are experienced in the conduct of class actions. Plaintiffs and their counsel have the necessary resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibility to the class members and are determined to diligently discharge those duties to obtain the best possible recovery for the Class.

36. All class members have the same legal rights under the VPPA. Defendant's violations of the VPPA have affected numerous individuals throughout the United States of America in a similar way. The class action is superior to any other method for remedying Defendant's violations of the VPPA given that common questions of fact and law predominate

and the liquidated damage provisions of the VPPA make the remedy available to class members identical. Class treatment is likewise indicated to ensure optimal compensation for the Class and limiting the expense and judicial resources associated with thousands of potential claims.

37. Defendants knowingly distributed "personal identifiable information," pertaining to Plaintiffs and the members of the Class to third-parties, in violation of the VPPA. 18 U.S.C. §2710. Defendant's distribution of this "personal identifiable information" did not meet any of the enumerated exceptions nor was the distribution for a purpose authorized by the VPPA.

38. Pursuant to the VPPA, 18 U.S.C. §2710, Defendants are liable for knowingly distributing "personal identifiable information" pertaining to Plaintiffs and the members of the Class to third parties in violation of the VPPA.

39. Plaintiffs and the members of the Class are entitled to liquidated damages in the amount of $2,500.00 for each instance in which Defendants violated the VPPA.

WHEREFORE, Plaintiffs demand judgment on his behalf and on behalf of the other members of the Class to the following effect:

    a. declaring that this action may be maintained as a class action;

    b. granting judgment in favor of Plaintiffs and the other members of the Class against the Defendant in the amount of $2,500.00 for each instance in which the Defendant disclosed, or used personal identifiable information concerning the Plaintiffs and members of the Class;

    c. punitive damages should be the Court find that the Defendants acted in willful or reckless disregard of the VPPA;

    d. reasonable attorney's fees and other litigation costs reasonably incurred

    e. requiring the Defendants to destroy any personal information illegally distributed; and

    f. such other relief as the Court deems appropriate.

# DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.

Respectfully submitted,

**THE COREA FIRM P.L.L.C.**

/Jeremy R. Wilson/
Thomas M. Corea
Texas Bar No. 24037906
Jeremy R. Wilson
Texas Bar No. 24037722
Preston J. Dugas III
Texas Bar No. 24050189
The Republic Center
325 North St. Paul Street, Suite 4150
Dallas, Texas 75201
Telephone:   214.953.3900
Facsimile:   214.953.3901

**OTSTOTT & JAMISON, P.C.**
George A. Otstott
Texas Bar No. 15342000
Ann Jamison
Texas Bar No. 00798278
Two Energy Square
4849 Greenville Avenue, Suite 1620
Dallas, Texas 75206
Telephone:   214.522.9999
Facsimile:   214.828.4388

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that on June 3, 2008, I electronically filed the above Motion with the Clerk of the Court using CM/ECF and that the Motion has been forwarded by CM/ECF to all counsel of record.

/Jeremy R. Wilson/
Jeremy R. Wilson