FILED

*Fee Paid*

2008 AUG 12 P 2: 19

RICHARD W. WIEKING,
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

*E-FILING*

*ADR*

1  Alan Himmelfarb - SBN 90480
2  KAMBEREDELSON, LLC
   2757 Leonis Boulevard
3  Vernon, California 90058
   Telephone: (323) 585-8696
4
5  Joseph H. Malley
   TX SBN: 12865900
6  LAW OFFICE OF JOSEPH H. MALLEY, P.C.
   1045 North Zang Boulevard
7  Dallas, Texas 75208
   Ph. (214) 943-6100
8  Fax (214) 943-6170

9  *Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
10 ## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION
11

12 | SEAN LANE, MOHANNAED SHEIKHA, SEAN
MARTIN, , ALI SAMMOUR, MOHAMMAED
13 ZIDAN, SARA KARROW, COLBY HENSON,
DENTON HUNKER, FIRAS SHEIKHA, HASSEN
14 SHEIKHA, LINDA STEWART,  TINA TRAN,
MATTHEW SMITH, ERICA PARNELL, JOHN
15 CONWAY, AUSTIN MUHS, PHILLIP HUERTA,
ALICIA HUNKER, individuals, on behalf of
16 themselves and all others similarly situated, and
MEGAN LYNN HANCOCK, a minor, by and
17 through her parent  REBECCA HOLEY,

18                                    Plaintiffs

19          v.

20 FACEBOOK, INC., a Delaware Corporation,
BLOCKBUSTER, INC., a Delaware Corporation,
21 FANDANGO, INC., a Delaware Corporation,
HOTWIRE, INC., a Delaware Corporation, STA
22 TRAVEL, INC., a Delaware Corporation,
OVERSTOCK.COM, INC., a Delaware
23 Corporation, ZAPPOS.COM, INC., a Delaware
Corporation. GAMEFLY, INC., a Delaware
24 Corporation.  AND JOHN DOES 1-40,
corporations

25                                    Defendants.

CASE NO.

**C08  03845**   **RS**

JURY DEMAND

COMPLAINT FOR:

1.  Violation of Electronic
    Communications Privacy Act,
    18 U.S.C.  § 2510; AND

2.  Violation of Computer Fraud
    and Abuse Act, 18 U.S.C.  §
    1030; AND

3.  Violation of Video Privacy
    Protection Act, 18 U.S.C. §
    2710; AND

4.  Violation of California's
    Consumer Legal Remedies Act,
    California Civil Code § 1750;
    AND

5.  Violation of California's
    Computer Crime Law, Penal
    Code § 502

**BY FAX**

26
27            ## CLASS ACTION COMPLAINT
28
   Plaintiffs, SEAN LANE, MOHANNAED SHEIKHA, SEAN MARTIN,, ALI

SAMMOUR, MOHAMMAED ZIDAN, SARA KARROW, COLBY HENSON, DENTON HUNKER, FIRAS SHEIKHA, HASSEN SHEIKHA, LINDA STEWART, TINA TRAN, MATTHEW SMITH, ERICA PARNELL, JOHN CONWAY, AUSTIN MUHS, PHILLIP HUERTA, ALICIA HUNKER, and MEGAN LYNN HANCOCK, by and through her parent REBECCA HOLEY (hereinafter, collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, KamberEdelson, LLC, and Law Office of Joseph H. Malley. P.C., as and for their complaint, allege as follows upon information and belief, based upon, inter alia, investigation conducted by and through their attorneys, which are alleged upon knowledge, sues Defendants FACEBOOK, INC, BLOCKBUSTER, INC., FANDANGO, INC., HOTWIRE, INC., STA TRAVEL, INC., OVERSTOCK.COM, INC., ZAPPOS.COM, INC., GAMEFLY, INC., and JOHN DOES, corporations and states:

### NATURE OF THE ACTION

1.    This is a class action lawsuit, brought by, and on behalf of similarly situated individuals whose privacy was violated by the actions of Facebook, Inc., ("Facebook"), and corporations associated with Facebook, ("Facebook Beacon Activated Affiliates"), which were involved in a online marketing joint venture ("Facebook Beacon").

2.    Facebook members who accessed the websites of one (1) or more of the Facebook Beacon Activated Affiliates, and engaged in any of a number of predetermined online activities ("Beacon Trigger Activities") found that their actions at the Facebook Beacon Activated Affiliates were disseminated to Facebook, Inc., published on their home and profile pages, and broadcast to any individuals the Facebook member had designated as a "user friend" on the Facebook website.

3.    Facebook and the Facebook Beacon Activated Affiliates acted both

independently and jointly in that they knowingly authorized, directed, ratified, approved, acquiescent, or participated by accessing and disclosing the personal information ("PI") and/or personal identifying information ("PII") derived from the activity of the Facebook member which had accessed the website of Facebook Beacon Activated Affiliate, without authority or consent of the Facebook member.

4.     The purpose of such actions by Facebook, Inc. and the Facebook Beacon Activated Affiliates, individually and jointly, was to solicit, advertise, and market business transactions to the Facebook user and the user's friends without having obtained any of the user's consent.

5.     The class action period, ( the "Class Period"), pertains to the date Facebook and the Facebook Beacon Activated Affiliates activated the Facebook Beacon to the date the Facebook default settings relating to the Facebook Beacon program were modified from "opt-out" to an "opt-in" setting, a period that roughly approximates on or about November 6, 2007 to December 5, 2007.

6.     This action does not include corporations which agreed to be a Facebook Beacon affiliate but did not activate Beacon.

7.     The conduct of Facebook, Inc. and Facebook Beacon Activated Affiliates, individually and jointly, violated one (1) or more of the following:

a)   Electronic Communications Privacy Act, 18 U.S.C. § 2510 (the "ECPA"), against ALL DEFENDANTS;

b)   Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA"), against ALL DEFENDANTS;

c)   Video Privacy Protection Act, 18 U.S.C. § 2710, (the "VPPA") against

FANDANGO, BLOCKBUSTER, OVERSTOCK, GAMEFLY, AND DOE

DEFENDANTS 1-20;

d) Aiding And Abetting / Civil Conspiracy To Violate The Video Privacy Protection

Act, against DEFENDANT FACEBOOK, ALONE

e) Consumer Legal Remedies Act, California Civil Code § 1750 (the "CLRA"), against

DEFENDANTS FACEBOOK, FANDANGO, HOTWIRE, STA, GAMEFLY, and

DOES 21-40

f) California's Computer Crime Law, Penal Code § 502 (the "CCCL"), against

DEFENDANT FACEBOOK, FANDANGO, HOTWIRE, STA, GAMEFLY, and

DOES 21-40.

## JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over all defendants because (a) a substantial

portion of the wrongdoing alleged in this complaint took place in this state, (b)  all defendants

are authorized to do business here, have sufficient minimum contacts with this state, and/or

otherwise intentionally avail themselves of the markets in this state through the promotion,

marketing and sale of products and services in this state, to render the exercise of jurisdiction by

this Court permissible under traditional notions of fair play and substantial justice.

9.      The following corporations are Delaware corporations headquartered in

California and are only citizens in California and Delaware. Plaintiffs assert claims of behalf of

a proposed class whose members are scattered throughout the fifty states (including the 48

states besides California and Delaware) and the U.S. territories: there is minimal diversity of

citizenship between proposed class members and the Defendant. The aggregate of these claims

exceed the sum or value of $5,000,000:

1. Facebook, Inc.;
2. Fandango, Inc.;
3. Hotwire, Inc.;
4. STA Travel, Inc.;
5. GameFly, Inc.

This Court has personal jurisdiction over the Defendants listed in this paragraph under Cal. Code Civ. Proc. § 410.10 because each of the listed defendants maintains its corporate headquarters in, and the acts alleged herein were committed in California.

10.    The following corporations are citizens of states other than California, however, each of the acts upon which liability is alleged herein were committed by the corporations listed in this paragraph in the state of California:

1. Blockbuster, Inc.,
2. Overstock.com, Inc.,
3. Zappos.com, Inc.

The heart of the conduct complained of involved the communication, transmission, and interception of personally identifying information and personal private data of the class members.  The mechanism to effectuate this communication, transmission and interception was devised, developed, and implemented in this judicial district in California.  The actual information and data from each of the Facebook Beacon Activated Affiliates was, without exception, transmitted to Facebook in California, therefore all evidence of wrongdoing as alleged in this complaint is located in this judicial district.

11.    This Court also has subject matter jurisdiction over all causes of action and the defendants implicated therein pursuant to 28 U.S.C. § 1332(d), and because this action arises in part under a federal statute and this Court has jurisdiction pursuant to 18 U.S.C. § 2710(c) which confers jurisdiction in the United States District Court for actions related to the Video Privacy Protection Act.

12.     Venue is proper in this District under 28 U.S.C. §1391(b) and (c).  A substantial portion of the events and conduct giving rise to the violations of law complained of herein occurred in this District.  Defendant Facebook Inc.'s principle executive offices and headquarters are located in this District at 156 University Avenue, Palo Alto, CA 94301.

### INTRADISTRICT ASSIGNMENT

13.     Intra-district assignment to the San Jose Division is proper because the principal offices of defendant Facebook, Inc., is located in Santa Clara County.

### PARTIES

14.     Plaintiff, MEGAN LYNN HANCOCK, by and through her parent REBECCA HOLEY; hereinafter "Hancock" is a resident of Dallas County, Texas. Hancock was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Hancock visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities.  Hancock believes and thereupon alleges that information related to Hancock's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Hancock's Facebook "Friends." MEGAN LYNN HANCOCK, a minor, by and through her parent REBECCA HOLEY, voids her Facebook, Inc. and Facebook Affiliate corporate membership in its entirety. Hancock accessed the following named Affiliate websites:

      i.  Blockbuster, Inc.

      ii.  Fandango, Inc.

15.     Plaintiff SEAN LANE; hereinafter "Lane" is a resident of Bison County, MA. Lane was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Lane visited one or more of the Named Affiliate's websites and engaged in one or

more of the Beacon Trigger Activities. Lane believes and thereupon alleges that information related to Lane's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Lane's Facebook "Friends." Lane accessed the following named Affiliate websites:

    i.  Hotwire, Inc.

    ii.  Overstock.com, Inc.

    iii.  Zappos.com, Inc.

16.    Plaintiff, MOHANNAED SHEIKHA; hereinafter "Sheikha" is a resident of Rockwall County, Texas. Sheikha was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Sheikha visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. Sheikha believes and thereupon alleges that information related to Sheikha's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Sheikha 's Facebook "Friends." Sheikha accessed the following named Affiliate websites:

    i.  Zappos.com, Inc.

17.    Plaintiff, SEAN MARTIN; hereinafter "Martin" is a resident of Dallas County, Texas. Martin was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Martin visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. Martin believes and thereupon alleges that information related to Martin's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Martin's Facebook "Friends." Martin accessed the following named Affiliate websites:

1

         i.  Blockbuster, Inc.

2

        ii.  Zappos.com, Inc.

3

    18.     Plaintiff ALI SAMMOUR hereinafter "Sammour" is a resident of Travis County,

4

Texas. Sammour was a member of Facebook during the Class Period. On one or more occasions

5

during the Class Period, Sammour visited one or more of the Named Affiliate's websites and

6

engaged in one or more of the Beacon Trigger Activities. Sammour believes and thereupon

7

8

alleges that information related to Sammour's engaging in one or more of the Beacon Trigger

9

Activities was captured by the Beacon Program and communicated to Facebook and/or others,

10

including Sammour's Facebook "Friends." Sammour accessed the following named Affiliate

11

12

websites:

13

         i.  Blockbuster, Inc.

14

        ii.  Fandango, Inc.

15

       iii.  Hotwire, Inc.

16

       iv.  Overstock.com, Inc.

17

        v.  STA Travel, Inc.

18

19

       vi.  Zappos.com, Inc.

20

      vii.  GameFly, Inc.

21

    19.     Plaintiff, MOHAMMED ZIDAN; hereinafter "Zidan" is a resident of Dallas

22

County, Texas. Zidan was a member of Facebook during the Class Period. On one or more

23

24

occasions during the Class Period, Zidan visited one or more of the Named Affiliate's websites

25

and engaged in one or more of the Beacon Trigger Activities. Zidan believes and thereupon

26

alleges that information related to Zidan's engaging in one or more of the Beacon Trigger

27

Activities was captured by the Beacon Program and communicated to Facebook and/or others,

28

including Zidan's Facebook "Friends." Zidan accessed the following named Affiliate websites:

    i.  Blockbuster, Inc.

    ii.  Fandango, Inc.

    iii.  Hotwire, Inc.

    iv.  Overstock.com, Inc.

    20.    Plaintiff, SARA KARROW; hereinafter "Karrow" is a resident of Dallas County, Texas. Karrow was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Karrow visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. Karrow believes and thereupon alleges that information related to Karrow's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Karrow's Facebook "Friends." Karrow accessed the following named Affiliate websites:

    i.  Zappos.com, Inc.

    21.    Plaintiff, COLBY HENSON; hereinafter "Henson" is a resident of Lubbock County, Texas. Henson was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Henson visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. Henson believes and thereupon alleges that information related to Henson's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Henson's Facebook "Friends." Henson accessed the following named Affiliate websites:

    i.  Overstock.com, Inc.

22.     Plaintiff, DENTON HUNKER; hereinafter "Hunker" is a resident of Tarrant County, Texas. Hunker was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Hunker visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. Hunker believes and thereupon alleges that information related to Hunker's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Hunker's Facebook "Friends." Hunker accessed the following named Affiliate websites:

     i.   Hotwire, Inc.

     ii.  Overstock.com, Inc.

23.     Plaintiff, FIRAS SHEIKHA; hereinafter "F. Sheikha" is a resident of Rockwall County, Texas. F. Sheikha was a member of Facebook during the Class Period. On one or more occasions during the Class Period, F. Sheikha visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. F. Sheikha believes and thereupon alleges that information related to F. Sheikha's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including F. Sheikha's Facebook "Friends." F. Sheikha accessed the following named Affiliate websites:

     i.   Blockbuster, Inc.

     ii.  Overstock.com, Inc.

24.     Plaintiff, HASSEN SHEIKHA; hereinafter "H. Sheikha" is a resident of Dallas, Texas. H. Sheikha was a member of Facebook during the Class Period. On one or more occasions during the Class Period, H. Sheikha visited one or more of the Named Affiliate's

1  websites and engaged in one or more of the Beacon Trigger Activities. H. Sheikha believes and

2  thereupon alleges that information related to H. Sheikha's engaging in one or more of the

3  Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook

4  and/or others, including H. Sheikha's Facebook "Friends." H. Sheikha accessed the following

5  named Affiliate websites:

6

7          i.   Overstock.com, Inc.

8          25.   Plaintiff, LINDA STEWART; hereinafter "Stewart" is a resident of Kaufman

9  County, Texas. Stewart was a member of Facebook during the Class Period. On one or more

10  occasions during the Class Period, Stewart visited one or more of the Named Affiliate's

11  websites and engaged in one or more of the Beacon Trigger Activities. Stewart believes and

12  thereupon alleges that information related to Stewarts's engaging in one or more of the Beacon

13  Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or

14  others, including Stewart's Facebook "Friends." Stewart accessed the following named Affiliate

15  websites:

16

17          i.   Hotwire, Inc.

18          ii.   Overstock.com, Inc.

19          iii.   Zappos.com, Inc.

20          26.   Plaintiff, TINA TRAN; hereinafter "Tran" is a resident of Dallas County, Texas.

21  Tran was a member of Facebook during the Class Period. On one or more occasions during the

22  Class Period, Tran visited one or more of the Named Affiliate's websites and engaged in one or

23  more of the Beacon Trigger Activities. Tran believes and thereupon alleges that information

24  related to Tran's engaging in one or more of the Beacon Trigger Activities was captured by the

25  Beacon Program and communicated to Facebook and/or others, including Tran's Facebook

"Friends." Tran accessed the following named Affiliate websites:

      i.  Overstock.com, Inc.

27.    Plaintiff, MATTHEW SMITH; hereinafter "Smith" is a resident of Tarrant County, Texas. Smith was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Smith visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. Smith believes and thereupon alleges that information related to Smith's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Smith's Facebook "Friends." Smith accessed the following named Affiliate websites:

      i.  Overstock.com, Inc.

28.    Plaintiff, ERICA PARNELL; hereinafter "Parnell" is a resident of Kaufman County, Texas. Parnell was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Parnell visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. Parnell believes and thereupon alleges that information related to Parnell's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Parnell's Facebook "Friends." Parnell accessed the following named Affiliate websites:

      i.  Blockbuster, Inc.

     ii.  Fandango, Inc.

   iii.  Hotwire, Inc.

   iv.  Overstock.com, Inc.

29.    Plaintiff, JOHN CONWAY; hereinafter "Conway" is a resident of Los Angeles

County, California. Conway was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Conway visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. Conway believes and thereupon alleges that information related to Conway's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Conway's Facebook "Friends." Conway accessed the following named Affiliate websites:

      i.  Overstock.com, Inc.

     ii.  GameFly, Inc.

    30.     Plaintiff, AUSTIN MUHS; hereinafter "Muhs" is a resident of Los Angeles County, California. Muhs was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Muhs visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. Muhs believes and thereupon alleges that information related to Muhs' engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Muhs' Facebook "Friends." Muhs accessed the following named Affiliate websites:

      i.  Blockbuster, Inc.

     ii.  Fandango, Inc.

    31.     Plaintiff, PHILLIP HUERTA; hereinafter "Huerta" is a resident of Los Angeles County, California. Huerta was a member of Facebook during the Class Period. On one or more occasions during the Class Period, Huerta visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. Huerta believes and thereupon alleges that information related to Huerta's engaging in one or more of the Beacon Trigger

Activities was captured by the Beacon Program and communicated to Facebook and/or others, including Huerta's Facebook "Friends." Huerta accessed the following named Affiliate websites:

    i.  Blockbuster, Inc.

    ii.  Hotwire, Inc.

    iii.  Overstock.com, Inc.

32.    Plaintiff, ALICIA HUNKER; hereinafter "A. Hunker" is a resident of Tarrant County, Texas. A. Hunker was a member of Facebook during the Class Period. On one or more occasions during the Class Period, A. Hunker visited one or more of the Named Affiliate's websites and engaged in one or more of the Beacon Trigger Activities. A. Hunker believes and thereupon alleges that information related to A. Hunker's engaging in one or more of the Beacon Trigger Activities was captured by the Beacon Program and communicated to Facebook and/or others, including A. Hunker's Facebook "Friends." A. Hunker accessed the following named Affiliate websites:

    i.  Overstock.com, Inc.

33.    Defendant Facebook, Inc. (hereinafter "FACEBOOK"), is a Delaware corporation which maintains its headquarters at 156 University Avenue, Palo Alto, CA 94301. Defendant Facebook, Inc., does business throughout the United States, and in particular, does business in State of California and in this County.

34.    Defendant Blockbuster Online is a registered trademark of Blockbuster, Inc. a Delaware corporation. Blockbuster, Inc. maintains its headquarters at 1201 Elm Street, Dallas, TX 75270. Blockbuster, Inc. launched Blockbuster Online in 2004 as its online subscription program. Defendant Blockbuster, Inc. (hereinafter "Blockbuster"), is a Delaware corporation which maintains its headquarters at 1201 Elm Street, Dallas, Texas 75270. Blockbuster, Inc. is a

provider of rental and retail movie and game entertainment with over 7,800 stores in the United States.  Defendants Blockbuster Online and Blockbuster, Inc do business throughout the United States, and in particular, do business in State of California and in this County.

35.     Defendant Fandango, Inc. (hereinafter "Fandango"), is a Delaware corporation which maintains its headquarters at 12200 W. Olympic Boulevard, Suite 150, Los Angeles, CA 90064. Formed in 2000, Fandango, Inc. "entertains and informs consumers with trailers, exclusive clips, celebrity interviews, fan reviews and news, while offering the ability to quickly select a film and conveniently buy tickets in advance."  Defendant Fandango, Inc. does business throughout the United States, and in particular, does business in State of California and in this County.

36.     Defendant Hotwire, Inc. (hereinafter "Hotwire"), is a Delaware corporation which maintains its headquarters at 333 Market Street, Suite 100, San Francisco, CA 94105. Founded in 2000, Hotwire, Inc. is a discount travel website offering airline tickets, hotel reservations, car rentals vacations packages and cruises.  Defendant Hotwire, Inc. does business throughout the United States, and in particular, does business in State of California and in this County.

37.     Defendant STA Travel, Inc. (hereinafter "STA"), is a Delaware corporation which maintains its headquarters at 5900 Wilshire Boulevard, Suite 900, Los Angeles, CA 90036 OR 750 State Hwy. 121, Suite 250, Lewisville, TX 75067. STA Travel, Inc. is a student travel organization that specializes in arranging air transportation, lodging, tours and ground transportation for college students. Defendant STA Travel, Inc., does business throughout the United States, and in particular, does business in State of California and in this County.

38.     Defendant Overstock.com, Inc. (hereinafter "Overstock"), is a Delaware

corporation which maintains its headquarters at 6350 South 3000 East, Salt Lake City, UT 84121. Launched in 1999, Overstock.com is an online retailer which sells companies' excess inventory. Defendant Overstock.com, Inc., does business throughout the United States, and in particular, does business in State of California and in this County.

39.    Defendant Zappos.com, Inc. (hereinafter "Zappos") is a Delaware corporation which maintains its headquarters at 2280 Corporate Circle, Suite 100, Henderson, NV 89074. Founded in 1999, Zappos.com, Inc. is an online retailer that sells shoes, clothing and accessories. Defendant Zappos.com, Inc., does business throughout the United States, and in particular, does business in State of California and in this County.

40.    Defendant GameFly, Inc. (hereinafter "GameFly"), is a Delaware corporation which maintains its headquarters at 5840 West Jefferson Boulevard, Suite J, Los Angeles, CA 90016. Founded in 2002, GameFly, Inc. owns and operates a website offering an online video game rental subscription service.  Defendant GameFly, Inc. does business throughout the United States, and in particular, does business in State of California and in this County.

41.    Defendants, John Does 1 - 40, are corporations or business entities whose specific identity is unknown to Plaintiffs. Plaintiffs therefore sue these Doe defendants by such fictitious names.   These Doe defendants are corporations similarly situated to the Facebook Beacon Activated Affiliates, who activated and had operating on their website the Facebook Beacon that affected the Plaintiffs as detailed herein.  The contractual obligations of Facebook may require Facebook to provide notice to the Facebook Beacon activated advertisers of this matter so as to appear and protect their interests, or these Facebook Beacon activated advertisers may provide notice to confirm their Beacon activity independent of Facebook.  In either case, when the identity of these Facebook Beacon activated advertisers who are sued as Doe

1    defendants are identified, Plaintiffs will amend their complaint to name such parties as

2    Facebook Beacon Activated Affiliates.

3        42.      This action arises out of the Facebook Beacon Activated Affiliates' websites

4
     using Facebook Beacon.  Facebook stated in its press release of November 6, 2007, that "44
5
     websites are using Facebook Beacon:
6

7        **Leading Websites Offer Facebook Beacon for Social Distribution**

8        Users Gain Ability to Share their Actions from 44 Participating Sites with their

9        Friends on Facebook

10
         NEW YORK — Facebook Social Advertising Event, Nov. 6, 2007 — Facebook
11       announced today that 44 websites are using Facebook Beacon to allow users to
         share information from other websites for distribution to their friends on
12       Facebook. These sites are participating in the launch of Beacon, a new way to
13       socially distribute information on Facebook. Beacon is a core element of the
         Facebook Ads system for connecting businesses with users and targeting
14       advertising to the audiences they want.

15       The websites participating in Beacon can determine the most relevant and
16       appropriate set of actions from their sites that users can distribute on Facebook.
         These actions can include posting an item for sale, completing a purchase,
17       scoring a high score in an online game or viewing of video. When users who are
18       logged into Facebook visit a participating site, they receive a prompt asking
         whether to they want to share those activities with their friends on Facebook. If
19       they do, those friends can now view those actions through News Feed or Mini-
         Feed stories.
20
         eBay plans to use Beacon so eBay.com sellers will be able to choose to include
21       their eBay listings in their Facebook News Feeds. This will allow them to share
22       the items they are selling with their network of friends. In doing so, eBay.com
         sellers can leverage a new way to drive potential bidders and buyers to their
23       listings. eBay expects to make this feature available to sellers on eBay.com in
         early 2008.
24
25       "Beacon offers an interesting new way for us to deliver on our goal of bringing
         more bidders and buyers to our sellers' listings," said Gary Briggs, senior vice
26       president and chief marketing officer, eBay North America. "In a marketplace
         where trust and reputation are crucial to success, giving sellers the ability to
27       easily alert their network of friends – the people who already know and trust
28       them – to an item for sale has the potential to be a powerful tool."

In keeping with Facebook's philosophy of user control, Facebook Beacon provides advanced privacy controls so Facebook users can decide whether to distribute specific actions from participating sites with their friends.

Fandango, the nation's leading moviegoer destination, is using Beacon so when Facebook users purchase a movie ticket on Fandango.com, they can share their movie plans with their friends on Facebook. Consumers gain a new way to tell their friends about their movie tastes, while Fandango is able to gain greater social distribution on Facebook.

"People love to share movies with their friends," said Chuck Davis, CEO of Fandango. "When it comes to movies, everyone has an opinion. Fandango is excited to be selected as one of the first sites to implement Beacon, allowing Facebook users to share the excitement of moviegoing with their friends."

A number of IAC brands, including CollegeHumor, Busted Tees, iWon, Citysearch, Pronto.com and echomusic will also be using Facebook Beacon to share actions taken on participating IAC sites from concert tickets to restaurant reviews with friends online. The sheer diversity and scale of IAC brands has the potential to enable Facebook friends to share the more interesting parts of their life online.

"IAC brands touch consumers in a multitude of different ways everyday. Bringing together great consumer services and products and the added ability to share individual actions with friends via Facebook can only add value to what we do and who we do it for," said Doug Lebda, president and chief operating officer of IAC.

As a way to let travelers tell their Facebook friends about upcoming travel plans, Travelocity is implementing Facebook Beacon on its website. When Facebook users book travel on Travelocity, they can choose to share that information with their friends on Facebook.

"Travel is naturally a social activity that travelers enjoy discussing with the people they know," said Jeff Glueck, chief marketing officer at Travelocity. "Using Beacon, Travelocity users can now easily choose to spread the news of their latest vacation plans on Facebook as a complement to their activities on the Travelocity website."

Additional websites and companies participating in Beacon at launch include AllPosters.com, Blockbuster, Bluefly.com, CBS Interactive (CBSSports.com & Dotspotter), ExpoTV, Gamefly, Hotwire, Joost, Kiva, Kongregate, LiveJournal, Live Nation, Mercantila, National Basketball Association, NYTimes.com, Overstock.com, (RED), Redlight, SeamlessWeb, Sony Online Entertainment LLC, Sony Pictures, STA Travel, The Knot, TripAdvisor, Travel Ticker, TypePad, viagogo, Vox, Yelp, WeddingChannel.com and Zappos.com.

1   **http://www.facebook.com/press/releases.php?p=9166**

2   Some of the business entities identified in Facebook's statement disputed that they had activated

3   the Beacon program.

4   **STATEMENT OF FACTS**

5

6   **The Facebook Service and Network**

7        43.    Facebook owns and operates an online web site located at

8   http://www.facebook.com.

9        44.    Facebook began as an online social network for college, then eventually high

10

11  school children, to exchange personal information confidentially with friends.

12       45.    Originally Facebook was self described as "free for use," and free of advertising.

13  Facebook still describes itself as "free for use."

14       46.    Facebook membership requires the user to provide their name, birth date, gender

15  and email address.

16       47.    Facebook requires users to register with a unique username and password in

17

18  order to access to its computer network.

19       48.    Facebook allows users to provide information about the user's "hometown" to

20  join a "network," which generally is a high school or college.

21       49.    The information described in Paragraphs 46, 47, and 48, above, can be used to

22  identify the user of the site, and to locate any individual.  Personally identifying information is

23

24  information that can be used to distinguish or trace an individual's identity, and when combined

25  or used with other identifying information, is, or can be linked or linkable to a specific

26  individual. The Chief Information Officer for the U.S. Department of Commerce defines

27  personally identifying information as "..information that indentifies individuals directly or by

28

reference."

50.     Facebook members also have the option to provide additional personal identifiable information including sexual preference, political and religious convictions, telephone numbers, address, activities, interests, education, work, and to post photos.

51.     Facebook's web site enables users to add "friends" to their profiles. This process connects one registrant's profile to another registrant's profile, giving each of the connected "friends" access to the other "friends" connected to the respective profiles. In this manner, Facebook's web site creates a virtual social network of interconnected profiles. "Friends" can send messages to one another over Facebook's proprietary computer network. Users may also send email to one another over the internet.

52.     Facebook user profiles are available for viewing and Facebook users may be contacted only by Facebook or persons who have a Facebook username and password.

53.     Initially when a user joins Facebook, his or her Profile is only viewable by other users who have been designated as the user's friend on Facebook (a "Friend").  Friends of a user can see all personal information that the user has provided to Facebook for the user's Profile. To restrict the information that is shared with Friends, a user must take further action and change his or her privacy settings.

54.     Facebook users can choose to join one or more networks, based on their school, workplace or region (a "Network").  Once a user joins a Network, Facebook automatically begins sharing some of that user's information with the other users that have joined the same Network.  The information that can be seen by other users in the Network is the same information that can be seen by a user's Friend, except for any contact information.  As with Friends, a user can also restrict information that is shared with other users in his or her Network.

However, to do so, the user must take further action and change his or her privacy settings. The viewing of detailed profile data is restricted to users from the same network or confirmed friends.

55.     Facebook's "Privacy Settings" are set by default to "My networks and friends" which allows the user's profile to be viewed by their friends and everyone in every network they join.

56.     Facebook's "Terms of Use" obligate individuals to be contractually bound once a person accesses or uses the website, even if they do not register as a member of Facebook. Prospective members who wish to review the "Terms of Use" prior to agreeing to any obligation must login and register in order to review "Platform Application Guidelines," Application Terms of Use," "Developer Terms of Use," which are incorporated by reference in the "Terms of Use."

57.     Facebook's "Privacy Policy" discusses a concern to protect the user privacy noting, "Our default settings limit the information displayed in your profile to your networks and other reasonable community limitations that we tell you about." The Facebook privacy settings are, however, defaulted to share users' personal information. If users wish to restrict the information that they share, they must opt-out of most of the sharing settings. It is important to note that users are not automatically directed to Facebook's privacy settings upon registering for Facebook.

58.     Facebook's "Terms of Use," states that it "is intended solely for users who are thirteen (13) years of age or older." In addition, anyone between the ages of 13 and 18 who is not in high school or college is prohibited from using the website. Their use is "unauthorized, unlicensed and in violation of these Terms of Use." Facebook's "Customer Support: Security,"

focuses on the safety and security of young people.

59.     Facebook's "Privacy Policy" forbids individuals under the age of 13 from registering as a member, but provides no age verification mechanism to confirm the age of its members and leaves self regulation to the children.

60.     Facebook's "Privacy Policy" recommends that parents of children 13 years and older should consider whether their child should be supervised during the child's use of the Facebook site, however there are no age verification mechanisms to confirm the age of its members, leaving self regulation to the children, and parents do not have to provide "express consent" for their minor child to become a member, although there exists known privacy issues, concerns, and contractual obligations.

61.     Facebook's "Terms of Use" include an assortment of "membership documents." Membership documents for Facebook, which reveal the prospective member's legal obligations are not located on one (1) page, but have sub-links within the documents to other documents incorporated by reference.

62.     In order to understand the Facebook Beacon program (only insofar as Facebook is concerned), a prospective Facebook member would need to download and interpret the following:

**FACEBOOK DOCUMENTS:**

| Document: | Word Count: | Hard Copy Count | Screen Count |
|---|---|---|---|
| Privacy Policy | 3,716 | 6 | 11 |
| Terms of Use | 6,495 | 8 | 3 |
| Code of Conduct | 719 | 2 | 17 |
| Copyright Policy | 847 | 2 | 3 |
| Terms of Sale | 2,699 | 4 | 8 |
| Marketplace Guidelines | 1,381 | 2 | 5 |
| Platform Application Guidelines | 1,165 | 2 | 4 |
| Application Terms of Use | 1,700 | 2 | 5 |
| Developer Terms of Use | 9,255 | 11 | 26 |
| **TOTAL:** | **27,977** | **39** | **82** |

63.    In order to change the privacy default settings of a user's account, a user would have to read, interpret and select 9 separate tabs displaying privacy options. The Facebook user would be obligated to read approximately 4 pages and 2,283 words in order to permit access only to their selected friends.

64.    In addition to the privacy policies located on the Facebook website, the Beacon program implicated the privacy statements and terms and conditions of use at the websites of the Facebook Beacon Activated Affiliates.

65.    Facebook's privacy policy concerns the collection and use of the user's personal information, "when using Facebook, located at www.facebook.com," and "this privacy statement covers the site www.facebook.com."  Interactions by Facebook users at the websites of Facebook Beacon Activated Affiliate are not included in the Facebook privacy policy.

**The Beacon Program**

66.    The Facebook Beacon program was launched on or about November 6, 2007.  It was introduced to Facebook advertisers and affiliates as:

> "Allow your customers to share with their friends the actions they take on your website. For user actions you define, Facebook Beacon will publish a story in the user's profile and to friends' News Feeds with a link back to your site."

> **Add 3 lines of code and reach millions of users.**

> Simply determine which user actions you would like publish to Facebook and add a few lines of code to your web page. Facebook Beacon actions include purchasing a product, signing up for a service, adding an item to a wish list, and more. When a user performs the action, they will be alerted that your website is sending a story to their profile and have a chance to opt out. No additional user action is needed for the story to be published on Facebook, and users remain in control of their information.

> **Promote your business in an organic, social way.**

Facebook Beacon enables your brand or business to gain access to viral distribution within Facebook. Stories of a user's engagement with your site may be displayed in his or her profile and in News Feed. These stories will act as a word-of-mouth promotion for your business and may be seen by friends who are also likely to be interested in your product. You can increase the number of friends who see these stories with **Facebook Social Ads**.

**Enable effortless sharing while protecting user privacy.**

User privacy is extremely important to Facebook. We designed Facebook Beacon to enable effortless sharing, but we've also put in features to protect user privacy. When you send an action to Facebook, the user is immediately alerted of the story you wish to publish and will be alerted again when they sign into Facebook. The user must proactively consent to have a story from your website published.

- - - - - - - - - - - - - - - - - - - -

## Cookies

67.    Under current web protocol, cookies are the principal method by which a website 'recognizes' a particular user.  A cookie is supposed to be a secret string of information written by one website to a user's browser and accessible only to that website. Under current web protocol, one should not be able to write a script that asks for information in a cookie set by another server.  A cookie's recognition can include the user's identity, preferences, past history (including purchases), and navigation and use of the website.  Cookies are created by the host website, and they communicate information back to the host website only when the browser is opened to the host website.  Cookies, generally speaking, are passive and dormant unless and until the host website sends a query to the computer when the user visits the site.

68.    Facebook's privacy policy stated:

"When you enter Facebook, we collect your browser type and IP address. This information is gathered for all Facebook visitors.  In addition, we store certain information from your browser using "cookies." A cookie is a piece of data stored on the user's computer tied to information about the user. We use session ID cookies to confirm that users are logged in. These cookies terminate once the

user closes the browser. By default, we use a persistent cookie that stores your login ID (but not your password) to make it easier for you to login when you come back to Facebook. You can remove or block this cookie using the settings in your browser if you want to disable this convenience feature."

69.     The default settings in a user's web browser generally allows "first-party" cookies, described within the Facebook and Facebook Beacon Activated Affiliates' "Terms of Use," but not "third-party" cookies which originate from a website different than the site you are visiting.   Facebook's "Privacy Policy" states, "This privacy policy covers the use of cookies by Facebook and does not cover the use of cookies or other tracking technologies by any of its advertisers."

70.     Both Facebook and all Facebook Beacon Activated Affiliates collected and retained personally identifiable information on persons who utilized their respective websites. The "cookies" used on both Facebook and Facebook Beacon Activated Affiliates could confirm the personal identity of the common member.

71.     "Personally Identifiable Information" is "information that links the customer or patron to particular materials or services."

72.     Facebook's Beacon activities did not occur on www.facebook.com.

**How Beacon Worked**

73.     Every time someone visited a Facebook Beacon Activated Affiliate's website and performed a pre-defined action, that action triggered a script that set the Beacon program into action.  The Beacon script contacted Facebook notifying Facebook of the event or action taking place at the Facebook Beacon Activated Affiliate's website.  Facebook then initiated one of two actions, depending upon whether the user that initiated the event at the Facebook Beacon Activated Affiliate's website was a Facebook member or not.

74.     Facebook Beacon's press release of November 6, 2007, stated:

"The websites participating in Beacon can determine the most relevant and appropriate set of actions from their sites that users can distribute on Facebook. These actions can include posting an item for sale, completing a purchase, scoring a high score in an online game or viewing of video."

75.    The "Beacon Triggered Activities," distinct to each Facebook Beacon Activated Affiliate, could have included, but were not limited to, a Facebook member engaging in any of the following activities : buy; wish_list; queue; sign_up; bid; review; add; book; comment; create; design; download; find; join; play; post; rate; rent; shop; subscribe; support; update; view; vote; watch; and/or order (hereinafter "Beacon Trigger Activities").

76.    Engaging in a Beacon Trigger Activity at a Facebook Beacon Activated Affiliates' website resulted in a communication of the user's activity to Facebook.

77.    If the user was a Facebook member (as determined by the presence of Facebook cookies on the user's computer), Facebook (in theory) generated a little Beacon pop-up alerting the user that information about his or her action was being sent to Facebook.  That pop-up actually emanated from Facebook even though the person seeing it did not click through to Facebook.  It was triggered by a tag on the Facebook Beacon Activated Affiliates' webpage page known as an iFrame, which then told the user's browser to load a page from Facebook within the Affiliate's website the user happens to be visiting.

78.    If the user was not a Facebook member, Facebook still obtained the notification from the Facebook Beacon Activated Affiliate.  Facebook then undertook the same action of (theoretically) generating a pop-up on the Facebook Beacon Activated Affiliate website, however, the iFrame was slightly modified – it was a ghost iFrame, so-called because the information was rendered transparent and the viewer did not see anything.  But the same data was still sent to Facebook, and Facebook still responded and interacted with the Facebook Beacon Activated Affiliate's website with respect to the user's transaction.

79.     For example, with respect to the Blockbuster website (a Facebook Beacon Activated Affiliate), any time any person bought or rented a movie, or even placed a movie in their queue for renting later, that action triggered the java script that sent notification of that action to Facebook, regardless of whether the person using the services of the Blockbuster website was a Facebook customer or not.

80.     What made the Beacon program distinguishable from other forms of website interaction, was the way in which a website that was *not* open in a user's browser (in this case, Facebook.com) had become actively involved in the exchange between a user and a third-party website. Beacon utilized cookies to obtain information from the user's computer, but used iFrames surreptitiously installed on third party websites to access the cookie information.

81.     With Beacon, however, information regarding user activities was being sent -- in real time -- to a third party website -- one which was not open or active in the user's browser, and one which, in many cases, the user may never even have visited or heard of. Further, this information was sent automatically and specifically, with respect to unique transactions engaged in by the user.

**Problems with Beacon**

82.     The Beacon program sent information regarding specific user transactions on Facebook Beacon Activated Affiliates' websites to Facebook regardless of whether the user was a Facebook member or not. Thus, no consent was sought, nor was any consent obtained from persons who utilize the Facebook Beacon Activated Affiliate's website who were not Facebook members. Thus, non-Facebook persons who utilized the Facebook Beacon Activated Affiliate websites were not told that their transaction, and indeed, every transaction they engaged in upon the website was being communicated to a third party (Facebook) with whom they had no

1    relationship whatsoever.

2         83.    Even with respect to Facebook users, the Beacon program was not designed to

3    obtain any consent, and indeed, did not obtain any consent prior to the communication of

4    identifying transactional information to Facebook.  By the time any user was notified that

5    Facebook was (at a minimum), an observing party to the transaction, and that Facebook was

6    asking for an approval to publicly broadcast identifying information regarding the event,

7    personally identifying information had already been communicated to Facebook.

8

9         84.    Even with respect to the consent sought by Facebook and the Facebook Beacon

10   Activated Affiliate websites, the proffer to obtain that consent made to the user was wholly

11   inadequate, uninformed, misleading, untimely, and deceptive.  It was *inadequate* because, on

12   most Facebook Beacon Activated Affiliate websites, where it was operational at all, it was only

13   available as a quick pop-up for approximately 10 seconds or even less, and if a user missed it,

14   misunderstood it, had another window browser open, or even looked in the wrong direction

15   when it was momentarily available, such actions and a host of other similar non-consensual

16   occurrences were all interpreted as and defaulted to "consent."  It was *uninformed* because the

17   pop up did not explain or specify how, which, or through what means the information

18   concerning the transaction at the Facebook Beacon Activated Affiliate website would be

19   broadcast both to Facebook and to the Facebook user's friends list.  It was *misleading* because it

20   implied that the user was given some control over information to be communicated when, in

21   fact, no such control was offered or available to the user.  It was *untimely* because by the time

22   the pop up asked for consent to communicate transactional information, the transactional

23   information had already been communicated.  Declining to provide consent only concealed the

24   fact that the information had already been transmitted.  It was *deceptive* because, in almost

25

26

27

28

every instance, the information sharing was contrary to the stated privacy policies of the Facebook website and every other Facebook Beacon Activated Affiliate that had signed up for the program.

85.     The Beacon program was further an invasion of privacy in that the program automatically linked identities and data sharing without user permission. Thus, Facebook Beacon Activated Affiliate websites automatically and instantly learned which of their users were Facebook users, even if the user employed an alias, or used different email address for different websites (a common practice to protect web identity).

86.     The Beacon program was further flawed in that the program was not only designed to be defaulted in favor of communicating personal information, it was designed and introduced with no global opt-out: In other words, there was no way to turn off the Beacon program. Each Facebook Beacon Activated Affiliate website had to be manually blocked with a specific and non-global privacy selection, with no opportunity to simply decline participation in the entire program. Even if a Facebook user declined to share personal information through Beacon on each of the 44 identified "partner" websites, such action would have no effect upon any new Beacon "partner" websites added after the 44 Beacon partner sites were individually declined. In other words, the Beacon program was *designed* to be difficult, cumbersome, and time-consuming to block.

87.     Plaintiff SEAN LANE'S experience with the Beacon program was typical of the various pitfalls and inadequate disclosures that made the program such an invasive violation of web privacy:

### "Feeling Betrayed, Facebook Users Force Site to Honor Their Privacy"

"Sean Lane's purchase was supposed to be a surprise for his wife. Then it appeared as a news headline -- "Sean Lane bought 14k White Gold 1/5 ct

Diamond Eternity Flower Ring from overstock.com" -- last week on the social networking Web site Facebook.

Without Lane's knowledge, the headline was visible to everyone in his online network, including 500 classmates from Columbia University and 220 other friends, co-workers and acquaintances.

And his wife.

The wraps came off his Christmas gift thanks to a new advertising feature called Beacon, which shares news of Facebook members' online purchases with their friends. The idea, according to the company, is to allow merchants to effectively turn millions of Facebook users into a "word-of-mouth promotion" service.

Lane called it "Christmas ruined," and more than 50,000 other users signed a petition in recent days calling on Facebook to stop broadcasting people's transactions without their consent."

For Lane, spoiling his wife's surprise was bad enough.

Within two hours after he bought the ring on Overstock.com, he received an instant message from his wife, Shannon: Who is this ring for?

What ring, he messaged back, from his laptop at work in Waltham, Mass.

She said that Facebook had just put an item on his page saying he bought a ring. It included a link to Overstock, which noted that the 51 percent discount on the ring.

Lane, 28, a technical project manager at an online printing company, was crestfallen. He had gone to lengths to keep the ring a secret, even telling Shannon he was not going to give her jewelry this year."

Lane complained to Overstock. Company spokesman Judd Bagley said this week that on Nov. 21, Overstock abandoned its Beacon feature until Facebook changes its practice so that users must volunteer if they want to participate.

"I was really disappointed because for me the whole fun of Christmas is the surprise," said Shannon Lane, 28, who married Sean a year ago in September. "I never want to know what I'm getting."

*Washington Post,* November 30, 2007.

http://www.washingtonpost.com/wp-dyn/content/article/2007/11/29/AR2007112902503.html

88.     On November 29, 2007, the following article appeared in the [Weblog] New

1 | York Times.

2 | Facebook Executive Discusses Beacon Brouhaha

3 | By Brad Stone

4 | *Update: The interview below took place hours before Facebook announced a*
5 | *major change in its Beacon system, one that requires users to explicitly approve*
6 | *the sending of information to their friends' News Feeds. See our article for*
    | *details.*

7 | Facebook does not appear to be conceding much ground on Beacon — the
8 | program that informs a person's Facebook friends what he has purchased or
9 | posted on sites like Fandango.com, Yelp.com and NYTimes.com.

10 | Earlier today I spoke with Chamath Palihapitiya, vice president of product
    | marketing and operations at Facebook. Mr. Palihapitiya said the company was
11 | listening to its users and described three changes Facebook was making to
    | Beacon. First, the opt-out boxes on Beacon partner sites, which let users specify
12 | if they do not want their Facebook friends to be notified of their purchases or
13 | online activity, will now load more quickly, ensuring that more users see them.

14 | Second, Facebook will now be able to determine whether the opt-out notification
    | has been properly loaded on the user's screen — an indication of whether the
15 | user has actually been given an opportunity to opt-out.

16 | Finally, if users fail to approve or decline the Facebook alert on the partner site,
17 | Facebook will no longer assume the user is agreeing by omission. Instead, it will
    | offer another, more visible opportunity to opt-out to users on Facebook itself. If
18 | no action is taken within two days, Facebook will assume the user complies and
19 | will publish the action in the news feed.

20 | "We don't want to catch anyone off guard," Mr. Palihapitiya said. "We are
    | giving them an explicit and clear way to know what has happened and for them
21 | to publish."

22 | More information on Beacon from our conversation:

23 | Q. Will Facebook ever make Beacon "opt-in" instead of "opt-out," as critics
24 | have suggested, or simply give users a single way to decline to participate in the
25 | service altogether?

26 | A. Mr. Palihapitiya said the company learned from the similar controversy over
    | the introduction of the News Feed last year that people need to be given a chance
27 | to try new features. "We think Beacon has the same potential" as News Feed, he
    | said. "We want people to try it, to see it in action. If they don't like it they can
28 | easily turn it off. Our point of view is, let's give people the ability to sample it."

Q. Why not give people a universal opt-out of the Beacon service?

A. "We think the right way to offer this is on a site-by-site basis. We want people to see how the product behaves on different sites."

Q. But some people are asking for a single opt-out.

A. "One of the things we try to do is listen to feedback as much as possible. Just to give you where a lot of this feedback is coming from, it's coming more from the press than specific users," he said. "Right now, the right thing to do is to make sure we speak to actual users, not the pundits."

Q. It's not pundits though — it is users and advocates concerned about privacy.

A. "I'm not trying to diminish that," he said. "The feedback we've gotten from actual users using this product has allowed us to refine it, and here's the first set of changes. If there is demand for a different set of features, we'll do that as well."

Q. If I buy tickets on Fandango, and decline to publish the purchase to my friends on Facebook, does Facebook still receive the information about my purchase?

A. "Absolutely not. One of the things we are still trying to do is dispel a lot of misinformation that is being propagated unnecessarily."

Q. Were users properly informed about Beacon from the start?

A. "The way that we announce products is generally through blogging and through Rooster stories," he said, referring to prominent alerts from Facebook that appear in users' News Feeds. "We followed that exact same protocol for this product that we followed for many other product releases in the past. What we don't do is proactively push e-mail or other things to users. What we try to do is use the service itself to communicate about improvements and features we make. But our takeaway is we need to make sure we do a better and better job on that."

Q. I think MoveOn will see this as you guys digging in.

A. "The thing is, we haven't dug in in any way. We have pretty markedly changed the product based on the feedback we've gotten. What I'm saying is, it's still important that people have a chance to see it and make a decision for themselves."

http://bits.blogs.nytimes.com/2007/11/29/facebook-responds-to-beacon-brouhaha

89.    On December 5, 2007, Facebook issued the following press release from Mark

1    Zuckerberg, founder of Facebook:

2

3    **Announcement: Facebook Users Can Now Opt-Out of Beacon Feature**

4    Thoughts on Beacon

5
6    About a month ago, we released a new feature called Beacon to try to help
     people share information with their friends about things they do on the web.
     We've made a lot of mistakes building this feature, but we've made even more
7    with how we've handled them. We simply did a bad job with this release, and I
     apologize for it. While I am disappointed with our mistakes, we appreciate all
8    the feedback we have received from our users. I'd like to discuss what we have
     learned and how we have improved Beacon.
9

10   When we first thought of Beacon, our goal was to build a simple product to let
     people share information across sites with their friends. It had to be lightweight
11   so it wouldn't get in people's way as they browsed the web, but also clear
     enough so people would be able to easily control what they shared. We were
12   excited about Beacon because we believe a lot of information people want to
     share isn't on Facebook, and if we found the right balance, Beacon would give
13   people an easy and controlled way to share more of that information with their
14   friends.

15   But we missed the right balance. At first we tried to make it very lightweight so
16   people wouldn't have to touch it for it to work. The problem with our initial
     approach of making it an opt-out system instead of opt-in was that if someone
17   forgot to decline to share something, Beacon still went ahead and shared it with
     their friends. It took us too long after people started contacting us to change the
18   product so that users had to explicitly approve what they wanted to share.
     Instead of acting quickly, we took too long to decide on the right solution. I'm
19   not proud of the way we've handled this situation and I know we can do better.
20

21   Facebook has succeeded so far in part because it gives people control over what
     and how they share information. This is what makes Facebook a good utility,
22   and in order to be a good feature, Beacon also needs to do the same. People
     need to be able to explicitly choose what they share, and they need to be able to
23   turn Beacon off completely if they don't want to use it.
24

25   This has been the philosophy behind our recent changes. Last week we changed
     Beacon to be an opt-in system, and today we're releasing a privacy control to
26   turn off Beacon completely. You can find it here. If you select that you don't
     want to share some Beacon actions or if you turn off Beacon, then Facebook
27   won't store those actions even when partners send them to Facebook.

28

On behalf of everyone working at Facebook, I want to thank you for your feedback on Beacon over the past several weeks and hope that this new privacy control addresses any remaining issues we've heard about from you.

Thanks for taking the time to read this.

Mark

- - - - - - - - - - - - - - - - - -

### CLASS ALLEGATIONS
### Allegations as to Class Certification

90.     Plaintiffs bring this Complaint on behalf of themselves and the following class with respect to Plaintiff's claims for violation of the Electronic Communications Privacy Act ("ECPA"), and Violation of the Federal Computer Fraud And Abuse Act ("CFA") against *ALL DEFENDANTS*:

> All Facebook members who, during the period of November 7, 2007 to December 5, 2007 (the "Class Period"), visited one or more the Facebook Beacon Activated Affiliates' websites and engaged in one or more activities that triggered the Beacon program to communicate with Facebook regarding the activity.
>
> (Hereinafter, "ECPA / CFA CLASS.")

91.     Plaintiffs bring this Complaint on behalf of themselves and the following class with respect to Plaintiff's claims for Aiding And Abetting Violations Of The Video Privacy Protection Act, Civil Conspiracy To Violate The Video Privacy Protection Act, Violation Of Consumer Legal Remedies Act, Violation Of California's Computer Crime Law, and Unjust Enrichment against *DEFENDANT FACEBOOK, ALONE*:

> All Facebook members who, during the period of November 7, 2007 to December 5, 2007 (the "Class Period"), visited one or more the Facebook

Beacon Activated Affiliates' websites and engaged in one or more

activities that triggered the Beacon program to communicate with

Facebook regarding the activity.

(Hereinafter, "FACEBOOK CLASS.")

92.     Plaintiffs bring this Complaint on behalf of themselves and the following class

with respect to Plaintiff's claims for violation of the Video Privacy Protection Act ("VPPA"),

against DEFENDANTS *FANDANGO, BLOCKBUSTER, GAMEFLY, AND OVERSTOCK*

(hereinafter "VPPA Defendants"):

All Facebook members who, during the period of November 7, 2007 to

December 5, 2007 (the "Class Period"), visited one or more the VPPA

Defendants websites and engaged in one or more activities that triggered

the Beacon program to communicate with Facebook regarding the activity.

(Hereinafter, "VPPA CLASS.")

93.     Plaintiffs bring this Complaint on behalf of themselves and the following class

with respect to Plaintiff's claims for violation of the Consumer Legal Remedies Act ("CLRA"),

and Violation Of California's Computer Crime Law ("CCCL"), against DEFENDANTS

*FANDANGO, HOTWIRE, , GAMEFLY, AND STA*   (hereinafter "CLRA / CCCL Defendants"):

All Facebook members who, during the period of November 7, 2007 to

December 5, 2007 (the "Class Period"), visited one or more the CLRA /

CCCL Defendants websites and engaged in one or more activities that

triggered the Beacon program to communicate with Facebook regarding the

activity.

(Hereinafter, "CLRA / CCCL CLASS.")

94.    Plaintiffs reserve the right to revise these definitions of the classes based on facts they learn during discovery.

95.    The classes are brought pursuant to Federal Rule of Civil Procedure 23 (the "Classes"). Excluded from the Classes are i) any Judge or Magistrate presiding over this action, and the court personnel supporting the Judge or Magistrate presiding over this action, and members of their respective families; ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which a Defendant or its parent has a controlling interest and their current or former employees, officers and directors; and iii) persons who properly execute and file a timely request for exclusion from the class and iv) the legal representatives, successors or assigns of any such excluded persons.

96.    **Numerosity:**  Individual joinder of all members of the Class is impracticable. When Facebook introduced the Beacon program, Facebook had more than 60 million members. The Facebook Beacon Activated Affiliates are in many cases, themselves heavily trafficked websites.  Defendant Blockbuster alone has more than 1.6 million users for its online video rental service.  There are estimated to be tens of thousands of Class members.  Upon information and belief, class members can be identified by the electronic records of defendants.

97.    **Class Commonality:**  Common questions of fact and law exist as to all Class members and predominate over the questions affecting only individual Class members.  All class members were Facebook users during the Class Period.  All Facebook users who engaged in a Beacon Trigger Activity at one of the Facebook Beacon Activated Affiliate's websites during the class period had their information and activities disclosed to Facebook and others. This disclosure took place automatically because the Beacon program was designed to send such information as soon as a Facebook member engaged in one or more of the pre-specified

1    activities that triggered the Beacon script.

2        98.    Common questions include:

3            a.   What was the Beacon program and how did it work;

4
5            b.   What information did the Bacon program collect and what did it do with that

6                 information;

7            c.   Was there proper *or any* notice, of the operation of the Beacon program to

8                 consumers?

9            d.   Was there proper *or any* opportunity to decline the operation of the Beacon

10                program provided to consumers?

11
12           e.   Whether Facebook members, by virtue of their membership, had pre-consented

13                to the operation of the Beacon program on the non-Facebook websites:

14           f.   Did the operation, function, and/or implementation of the Beacon program

15                violate the ECPA?;

16
17           g.   Did the operation, function, and/or implementation of the Beacon program

18                violate the VPPA?

19           h.   Did the implementation of the Beacon program by the CLRA Defendants violate

20                the CLRA?

21           i.   Did the operation, function, and/or implementation of the Beacon program

22                violate the CCCL?

23
24           j.   Did the operation, function, and/or implementation of the Beacon program

25                violate the CFAA?

26           k.   Is Facebook liable under a theory of aiding and abetting, or conspiracy, for the

27                Affiliate Defendant's violations of the VPPA?

28

l.  Did the Beacon program send back to Facebook "personally identifying information?;

m. Whether, by its misconduct as set forth herein, Facebook and the CLRA defendants engaged in unfair, deceptive, untrue, or misleading promotion, implementation, and operation of their websites;

n. Was Facebook unjustly enriched by its actions in implementing the Beacon Program?;

o. Are class members entitled to damages as a result of the implementation of the Beacon program, and, if so, what is the measure of those damages?

99.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the class members.  Similar or identical statutory and common law violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison to the numerous common questions that dominate.

100.    The injuries sustained by the class members flow, in each instance, from a common nucleus of operative facts.  In each case Defendants caused or permitted unauthorized communications of private and personally identifying information to be delivered to Facebook and others through the use of the Beacon program without adequate notice, consent, or opportunity to opt out.

101.    **Typicality:**  Plaintiffs' claims are typical of the claims of other members of the Class, as the Plaintiffs and other Class members were all subjected to Defendant's identical wrongful conduct based upon the same transactions which occurred uniformly to the Plaintiffs and to the public.

102.    **Adequacy**:  Plaintiffs will fairly and adequately protect the interests of the class.

Plaintiffs are familiar with the basic facts that form the bases of the proposed class members' claims. Plaintiffs' interests do not conflict with the interests of the other class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class action litigation and intend to prosecute this action vigorously. Plaintiffs' counsel has successfully prosecuted complex actions including consumer protection class actions. Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the class members.

103.   **Superiority**: The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the proposed class members. The relief sought per individual member of the class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendants. Furthermore, it would be virtually impossible for the class members to seek redress on an individual basis. Even if the class members themselves could afford such individual litigation, the court system could not.

104.   Individual litigation of the legal and factual issues raised by the conduct of Defendants would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court.

105.   Given the similar nature of the class members' claims and the absence of material differences in the state statutes and common laws upon which the class members' claims are based, a nationwide class will be easily managed by the Court and the parties.

106.   The court may be requested to also incorporate subclasses of Plaintiffs, defendants, or both, in the interest of justice and judicial economy.

107.   In the alternative, the class may be certified because:

a)  the prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudication with respect to individual class members which would establish incompatible standards of conduct by defendant;

b)  the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c)  Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final and injunctive relief with respect to the members of the class as a whole.

**Count I:**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**Against All Defendants**

108.    Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

109.    Plaintiffs assert this claim against each and every Defendant on behalf of themselves and the Class.

110.    The federal Electronic Communications Privacy Act of 1986 ("ECPA", at 18 U.S.C. § 2511(1) makes it unlawful for a person to "willfully intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 USC 2520(a) provides a civil cause of action to "any person

whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of the ECPA.

111.    The transmission of data by Plaintiffs and the Class between their computers and the websites of the Facebook Beacon Activated Affiliate Defendants and each of them, including, but not limited to, communications regarding buy; wish_list; queue; sign_up; bid; review; add; book; comment; create; design; download; find; join; play; post; rate; rent; shop; subscribe; support; update; view; vote; watch; and/or order, constitute "electronic communications" within the meaning of 18 U.S.C. §2510.

112.    Defendants have intentionally obtained and/or intercepted, by device or otherwise, these electronic communications without Plaintiffs' or Class members' knowledge, consent, or authorization and while the communications were still en route.

113.    Defendants have intentionally disclosed to another person, and have otherwise used, such electronic communications, with knowledge, or having reason to know, that the electronic communications were obtained through interception, for an unlawful purpose.

114.    Defendants intentional interception of these electronic communications without Plaintiffs' or Class members' knowledge, consent, or authorization was undertaken without a facially valid court order or certification.

115.    Defendants exceeded their authorization to access and control private information concerning Plaintiffs' electronic communications, in violation of 18 U.S.C. § 2701.

116.    Defendants unlawfully and knowingly divulged Plaintiffs' electronic communication contents and user information, in violation of 18 U.S.C. § 2702.

117.    Defendants intentionally acquired and/or intercepted the contents of electronic communications sent by and/or received by Plaintiffs through the use of an electronic device.

Defendants intentionally acquired the communications that had been sent from or directed to Plaintiffs through their use of computers and other electronic devices which were part of, and utilized in, Defendants' electronic communications system, in violation of 18 U.S.C. § 2511 and pursuant to 18 U.S.C. § 2520.

118.    Defendants unlawfully accessed and used, and voluntarily disclosed, the contents of the intercepted communications to enhance their profitability and revenue through advertising.  This disclosure was not necessary for the operation of Defendants' system or to protect Defendants' rights or property.

119.    Plaintiffs are "person[s] whose … electronic communication is intercepted … or intentionally used in violation of this chapter" within the meaning of 18 U.S.C. § 2520.

120.    Defendants are liable directly and/or vicariously for this cause of action. Plaintiffs therefore seek remedy as provided for by 18 U.S.C. § 2520, including such preliminary and other equitable or declaratory relief as may be appropriate, damages consistent with subsection (c) of that section to be proven at trial, punitive damages to be proven at trial, and a reasonable attorney's fee and other litigation costs reasonably incurred

121.    Plaintiffs and the Class, pursuant to 18 U.S.C. §2520, are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, reasonable attorneys' fees, and Defendants' profits obtained from the above-described violations.

### Count II:
### VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT
### - 18 U.S.C. § 2710
### against Fandango, Blockbuster, Overstock, GameFly, and Doe Defendants 1-20
### (hereinafter "VPPA Defendants")

122.    Plaintiffs incorporate the above allegations by reference as if set forth herein at

length.

123.    The Video Privacy Protection Act of 1988 (codified at 18 U.S.C. § 2710 (2002)) ("VPPA") was passed in reaction to the disclosure of Supreme Court nominee Robert Bork's video rental records in a newspaper. The bill was drafted by Senator Leahy, who noted during the floor debate that new privacy protections are necessary in "an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers...." S. Rep. No. 100-599, 100th Cong., 2d Sess. at 6 (1988).

124.    The VPPA defines "personally identifiably information" as that which "identifies a person as having requested or obtained specific video materials or services from a video tape service provider." A "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale or delivery of prerecorded video cassette tapes or similar audiovisual materials."

125.    Video tape service providers may disclose personally identifiable information only:

- o   to the consumer him- or herself;

- o   to any other person, with the written consent of the consumer;

- o   to any other person, if the disclosure is simply of names and addresses, and

  - ▪   -the consumer has been provided with an opportunity to opt-out; and

  - ▪   -the disclosure does not identify title, description or subject matter (though subject matter may be disclosed if "for the exclusive use of marketing goods and services to the consumer");

- o   to any other person, if in the ordinary course of business;

     o   to a law enforcement agency, pursuant to a federal or state warrant, a grand jury subpoena, or a court order, provided that

        ■  -the consumer is provided with prior notice, and

        ■  -there is a showing of probable cause to believe that the records are relevant to a legitimate law enforcement enquiry;

     o   or

     o   pursuant to a court order in a civil proceeding, upon showing of a compelling need, provided

        ■  -the consumer is given reasonable notice; and

        ■  -afforded the opportunity to contest the request.

126.    The VPPA permits any person aggrieved by a violation of its disclosure rules to bring a civil action for damages in a federal court.

127.    Defendant Blockbuster owns and operates a publicly accessible website for products and /or services.  That website provides consumers with access to prerecorded video cassette tapes or similar audiovisual materials.  During the class period, Facebook members who visited that website and engaged in one or more of the Beacon Trigger Activities, including, but not limited to  accessing, requesting, purchasing, commenting upon, downloading and/or viewing specific video materials or services had such activities, along with their personally identifying information, communicated to Facebook.  Even if the Facebook member was provided with the option to decline the communication through a small, pop-up window visible for a few seconds (which in most cases he or she was not), the information was communicated to Facebook even when the Facebook member expressly declined to share such information.

128. Defendant Fandango owns and operates a publicly accessible website for products and /or services. That website provides consumers with access to prerecorded video cassette tapes or similar audiovisual materials. During the class period, Facebook members who visited that website and engaged in one or more of the Beacon Trigger Activities, including, but not limited to accessing, requesting, purchasing, commenting upon, downloading and/or viewing specific video materials or services had such activities, along with their personally identifying information, communicated to Facebook. Even if the Facebook member was provided with the option to decline the communication through a small, pop-up window visible for a few seconds (which in most cases he or she was not), the information was communicated to Facebook even when the Facebook member expressly declined to share such information.

129. Defendant Overstock owns and operates a publicly accessible website for products and /or services. That website provides consumers with access to prerecorded video cassette tapes or similar audiovisual materials. During the class period, Facebook members who visited that website and engaged in one or more of the Beacon Trigger Activities, including, but not limited to accessing, requesting, purchasing, commenting upon, downloading and/or viewing specific video materials or services had such activities, along with their personally identifying information, communicated to Facebook. Even if the Facebook member was provided with the option to decline the communication through a small, pop-up window visible for a few seconds (which in most cases he or she was not), the information was communicated to Facebook even when the Facebook member expressly declined to share such information.

130.   Defendant GameFly owns and operates a publicly accessible website for products and /or services.  That website provides consumers with access to prerecorded video cassette tapes or similar audiovisual materials.  During the class period, Facebook members who visited that website and engaged in one or more of the Beacon Trigger Activities, including, but not limited to  accessing, requesting, purchasing, commenting upon, downloading and/or viewing specific video materials or services had such activities, along with their personally identifying information, communicated to Facebook.  Even if the Facebook member was provided with the option to decline the communication through a small, pop-up window visible for a few seconds (which in most cases he or she was not), the information was communicated to Facebook even when the Facebook member expressly declined to share such information.

131.   Each of the VPPA Defendants is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4) because each VPPA Defendant is a person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials as defined by the Act..

132.   Each of the VPPA Defendants knowingly disclosed personally identifiable information concerning each Facebook member -- and the Beacon Trigger Activities the Facebook member engaged in -- to Facebook without the informed written consent of the Facebook member.  Each of the VPPA Defendants knowingly consented to the operation of the Beacon program on their website and affirmatively incorporated special Beacon script that activated the program and its communications to Facebook when the Beacon Trigger Activities were engaged in by the Facebook member.

133.    Each of the VPPA Defendants is providing personally identifiable information within the meaning of 18 U.S.C. § 2710(a)(3) as the information communicated to Facebook includes information which identifies a person as having requested or obtained specific audiovisual materials or services from a VPPA Defendant.

134.    Each incident in which a VPPA Defendant provided personally identifiable information regarding a Facebook member as having requested or obtained specific video materials or services from a VPPA Defendant, is a separate and distinct violation of the VPPA, subject to the remedies provided under the VPPA, and specifically pursuant to 18 U.S.C. § 2710(c).

**Count III:**
**AIDING AND ABETTING**
**VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT**
**- 18 U.S.C. § 2710**
**Against Facebook**

135.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

136.    As fully described above, Defendant Facebook had full knowledge or should have reasonably known of the true nature of the wrongful conduct conducted by the VPPA Defendants.

137.    Defendant Facebook knew that, through the implementation of the Beacon Program, it would, in real time, receive personally identifying information along with specific identification of the audiovisual materials each of the Plaintiffs and the class members bought, rented, viewed, reserved, or otherwise designated.  Defendant Facebook designed, created, and implemented the Beacon Program. Defendant Facebook knew how the program would function once it was implemented on the VPPA Defendants' websites.  Defendant Facebook sold,

convinced, or otherwise encouraged each of the VPPA Defendants to place the Beacon script on their websites, so that when Facebook members engaged in a Beacon Trigger Activity at the VPPA Defendants' websites, the Beacon script would be triggered to transmit and disclose information that the VPPA specifically prohibits the disclosure of.

138.    Defendant Facebook aided and abetted such wrongful conduct, including providing the means and the tools to violate the VPPA.

139.    Defendant Facebook also aided and abetted the described wrongful conduct of the other Defendant Facebook by giving substantial assistance and/or encouragement that, separately considered, was wrongful in and of itself.

140.    Defendant Facebook knew, or should have known, that the conduct the VPPA defendants engaged in by use of the Beacon Program provided by Facebook was unlawful and that Facebook's provision of the Beacon program was the means by which that unlawful conduct took place.

141.    Defendant Facebook knew, or should have known, at all relevant times herein, its role as part of an overall illegal or tortious activity at the time that Facebook provided its assistance.

142.    As a direct and proximate result of the aiding and abetting of these acts, Plaintiffs have suffered injury and harm and loss, including, but not limited to, loss of the user's privacy with respect to their actions on the internet (where class members shop, where they browse, and what goods and services they seek), loss of privacy with respect to their associational relationships being disclosed to entities that otherwise would not have known or learned of such associational relationships (disclosure of Facebook membership to each VPPA defendant who implemented the Beacon program on their site); and loss of privacy with respect

to the names, titles, genres and types of audiovisual materials purchased, rented, or even viewed by the class members (direct violation of the VPPA).  The wrongful conduct aided and abetted by the Defendant Facebook was a substantial factor in causing this harm.

**Count IV**
**CIVIL CONSPIRACY ON BEHALF OF THE CLASS**
**Against Defendant Facebook**

143.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

144.    Defendant Facebook willfully, intentionally, and knowingly agreed and conspired with the VPPA Defendants to engage in the alleged wrongful conduct, including the VPPA Defendants violation of the VPPA.

145.    Defendant Facebook did the acts alleged pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of the others.

146.    As a direct and proximate result of the acts in furtherance of the conspiracy, Plaintiffs have suffered injury, damage, loss, and harm, including, but not limited to, loss of the user's privacy with respect to their actions on the internet (where class members shop, where they browse, and what goods and services they seek), loss of privacy with respect to their associational relationships being disclosed to entities that otherwise would not have known or learned of such associational relationships (disclosure of Facebook membership to each VPPA defendant who implemented the Beacon program on their site); and loss of privacy with respect to the names, titles, genres and types of audiovisual materials purchased, rented, or even viewed by the class members (direct violation of the VPPA).

147.    The wrongful conduct committed pursuant to the conspiracy was a substantial

1  factor in causing this harm.

2      148.    Defendant Facebook's intentional agreement to commit, and commission of,

3  these wrongful acts was willful, malicious, oppressive, and in conscious disregard of Plaintiffs'

4  rights, and Plaintiffs are therefore entitled to an award of punitive damages to punish their

5  wrongful conduct and deter future wrongful conduct.

6

7                              **Count V**
   **VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
8       **against Facebook, Fandango, Hotwire, STA, and GameFly**
              **(Hereinafter "CLRA California Defendants")**
9

10     149.    Plaintiffs incorporate the above allegations by reference as if set forth herein at

11  length.

12     150.    Defendant Fandango owns and operates a publicly accessible website for

13  products and/or services that it makes available to consumers throughout California and the

14  United States.  Consumer services are available through its website, and consumers can use the

15  service its website makes available to purchase tickets to films.  The website advises consumers

16  that the use of the website is subject to certain terms and conditions and/or a privacy policy that

17  governs the relationship between consumers and that website, and in particular, how the website

18  will use and/or disclose or not disclose information that the consumer provides to the website in

19  the context of the consumer's use of the website to third parties.  Nowhere in any of the terms

20  and conditions and/or in the privacy policy that governed the use of the website did the website

21  advise that Facebook members would have their information treated differently from other

22  consumers using the website.  Nowhere in any of the terms and conditions and/or in the privacy

23  policy that governed the use of the website did the website advise Facebook members that their

24  transactions on the website were, in real time, being communicated to the Facebook website, or

25

26

27

28

that those transactions included personally identifying information and specific product or service information in conjunction with the disclosure of their identity.

151.   Defendant Hotwire owns and operates a publicly accessible website for products and/or services that it makes available to consumers throughout California and the United States.  Consumer services are available through its website, and consumers can use the service its website makes available to purchase discount travel airline tickets, hotel reservations, car rentals vacations packages and cruises.  The website advises consumers that the use of the website is subject to certain terms and conditions and/or a privacy policy that governs the relationship between consumers and that website, and in particular, how the website will use and/or disclose or not disclose information that the consumer provides to the website in the context of the consumer's use of the website to third parties.  Nowhere in any of the terms and conditions and/or in the privacy policy that governed the use of the website did the website advise that Facebook members would have their information treated differently from other consumers using the website.  Nowhere in any of the terms and conditions and/or in the privacy policy that governed the use of the website did the website advise Facebook members that their transactions on the website were, in real time, being communicated to the Facebook website, or that those transactions included personally identifying information and specific product or service information in conjunction with the disclosure of their identity.

152.   Defendant STA owns and operates a publicly accessible website for products and/or services that it makes available to consumers throughout California and the United States.  Consumer services are available through its website, and consumers can use the service its website makes available to purchase air transportation, lodging, tours, and ground transportation.  The website advises consumers that the use of the website is subject to certain

terms and conditions and/or a privacy policy that governs the relationship between consumers and that website, and in particular, how the website will use and/or disclose or not disclose information that the consumer provides to the website in the context of the consumer's use of the website to third parties. Nowhere in any of the terms and conditions and/or in the privacy policy that governed the use of the website did the website advise that Facebook members would have their information treated differently from other consumers using the website. Nowhere in any of the terms and conditions and/or in the privacy policy that governed the use of the website did the website advise Facebook members that their transactions on the website were, in real time, being communicated to the Facebook website, or that those transactions included personally identifying information and specific product or service information in conjunction with the disclosure of their identity.

153.     Defendant GameFly owns and operates a publicly accessible website for products and/or services that it makes available to consumers throughout California and the United States. Consumer services are available through its website, and consumers can use the service its website makes available for video game rentals. The website advises consumers that the use of the website is subject to certain terms and conditions and/or a privacy policy that governs the relationship between consumers and that website, and in particular, how the website will use and/or disclose or not disclose information that the consumer provides to the website in the context of the consumer's use of the website to third parties. Nowhere in any of the terms and conditions and/or in the privacy policy that governed the use of the website did the website advise that Facebook members would have their information treated differently from other consumers using the website. Nowhere in any of the terms and conditions and/or in the privacy policy that governed the use of the website did the website advise Facebook members that their

transactions on the website were, in real time, being communicated to the Facebook website, or that those transactions included personally identifying information and specific product or service information in conjunction with the disclosure of their identity.

154.    The Consumer Legal Remedies Act ("CLRA") applies to the CLRA Defendant's actions and the conduct described herein because it extends to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

155.    Plaintiffs and each member of the Class are "consumers" within the meaning of Civil Code Section 1761 (d).

156.    The goods and services that are the subject of this litigation are "goods" and/or "services" within the meaning of Civil Code Section 1761 (a).

157.    The CLRA Defendants have violated the CLRA in at least the following respects:

- In violation of Section 1770 (a)(5) he CLRA Defendants have represented that the use of their websites have characteristics, uses, benefits, or quantities which they do not have;

- In violation of Section 1770 (a)(14), the CLRA Defendants have represented that the use of their websites confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.

158.    The CLRA Defendants concealed material facts regarding the use and implementation of their websites from Plaintiffs and other Class members, including the existence of the Beacon Program which automatically communicated real-time information regarding transactions of the consumer on the website to the Facebook website, including

1    personally identifying information and specific product or service information in conjunction

2    with the disclosure of their identity.

3         159.    This type of information is relied upon by consumers in making purchase

4    decisions, and is fundamental to the decision to purchase goods or services from one seller or

5

6    another.

7         160.    Had the CLRA Defendants disclosed this material information regarding the

8    presence, existence, and function of the Beacon program to Plaintiffs and the other Class

9    members, they would not have purchased the goods and /or services from their website.

10

11        161.    Plaintiffs and other Class members relied upon the CLRA Defendant's

12   misrepresentations to their detriment.

13        162.    The CLRA Defendants failure to disclose the presence, existence, and function

14   of the Beacon program to Plaintiffs and the other Class members are omissions and

15   concealments of material fact that constitute unfair, deceptive, and misleading business

16
     practices in violation of Civil Code Section 1770 (a).
17

18        163.    The CLRA Defendants deceptive acts and omissions occurred in the course of

19   selling a consumer product or service and have occurred continuously through the filing of this

20   Complaint.

21        164.    As a direct and proximate result of The CLRA Defendant's violation of Civil

22   Code Section 1770, et seq., Plaintiffs and other Class members have suffered irreparable harm.

23   Plaintiffs, on behalf of themselves and on behalf of a similarly situated Class of consumers,

24   seek injunctive relief.

25

26                                        **Count VI**
27        **VIOLATION OF CALIFORNIA'S COMPUTER CRIME LAW ("CCCL")**
                              **CAL. PENAL CODE § 502**
28              **against Facebook, Fandango, Hotwire, STA, and GameFly**

**(Hereinafter "CCCL California Defendants")**

165.   Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

166.   The CCCL Defendants have violated California Penal Code § 502(c)(1) by knowingly and without permission, accessing, taking, copying, and making use of data from Plaintiffs' computers in order to wrongfully obtain valuable private data from Plaintiffs.

167.   The CCCL Defendants have violated California Penal Code § 502(c)(2) by knowingly and without permission, accessing and taking data from Plaintiffs computers.

168.   The CCCL Defendants have violated California Penal Code § 502(c)(6) by knowingly and without permission providing, or assisting in providing, a means of accessing Plaintiff's computers, computer system, and/or computer network.

169.   The CCCL Defendants have violated California Penal Code § 502(c)(7) by knowingly and without permission accessing, or causing to be accessed, Plaintiffs' computer system, and/or computer network.

170.   Pursuant to California Penal Code § 502(b)(10) a "Computer contaminant" means any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information.   The CCCL Defendants have violated California Penal Code § 502(c)(8) by knowingly and without permission introducing a computer contaminant into the transactions between Plaintiffs and the CCCL defendants.

171.   As a direct and proximate result of CCCL Defendants' unlawful conduct within the meaning of California Penal Code § 502, CCCL Defendants have caused loss to Plaintiffs in

an amount to be proven at trial. Plaintiffs are also entitled to recover their reasonable attorneys' fees pursuant to California Penal Code § 502(e).

172.    Plaintiffs have also suffered irreparable injury from these unauthorized acts of disclosure, and due to the continuing threat of such injury, have no adequate remedy at law, entitling Plaintiffs to injunctive relief.

## Count VII
## VIOLATION OF FEDERAL COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. §§ 1030(a)(2)(C) & (a)(5)
### Against All Defendants

173.    Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

174.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing a computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a protected computer.

175.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)(i) by knowingly causing the transmission of a program, information, code, or command and as a result causing a loss to one or more persons during any one-year period aggregating at least $5,000 in value.

176.    Plaintiffs have suffered loss by reason of these violations, including, without limitation, violation of the right of privacy, disclosure of affiliation and business relationships between Plaintiffs and internet product and service providers, and disclosure of specific purchase and transactional information that otherwise is private, confidential, and not of public record.

177.    CFAA Defendants' unlawful access to Plaintiffs' computers and computer communications also have caused Plaintiffs irreparable injury.  Unless restrained and enjoined, CFAA Defendants will continue to commit such acts.  Plaintiffs' remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiffs to remedies including injunctive relief as provided by 18 U.S.C.  § 1030(g).

**Count VIII**
**Unjust Enrichment**
**Against Facebook**

178.    Plaintiffs incorporate by reference the foregoing allegations.

179.    A benefit has been conferred upon Facebook by Plaintiffs and the Class. On information and belief, Defendant, directly or indirectly, has received and retains information regarding the affiliation and business relationships between Plaintiffs and internet product and service providers, and has received and retains information regarding specific purchase and transactional information that is otherwise private, confidential, and not of public record

180.    Defendant Facebook appreciates or has knowledge of said benefit.

181.    Under principles of equity and good conscience, Defendant Facebook should not be permitted to retain the information which it has acquired by virtue of its unlawful conduct. All funds, revenues, and benefits received by Defendant Facebook through its Beacon program rightfully belong to Plaintiffs and the Class, which Defendant has unjustly received as a result of its actions.

**Prayer For Relief**

WHEREFORE, Plaintiffs respectfully pray for the following:

   a)   With respect to all counts, declaring the action to be a proper class action and designating Plaintiffs and their counsel as representatives of the Class;

b) As applicable to the Class *mutatis mutandis*, awarding injunctive and equitable relief including, *inter alia*: (i) prohibiting Defendants from engaging in the acts alleged above; (ii) requiring Defendants to disgorge all of their ill-gotten gains to Plaintiffs and the other Class members, or to whomever the Court deems appropriate; (iii) requiring Defendants to delete all data surreptitiously or otherwise collected through the acts alleged above; (iv) requiring Defendants to provide Plaintiffs and the other class members a means to easily and permanently decline any participation in the Beacon program and an opportunity to decline any future iteration of the Beacon program; (v) awarding Plaintiffs and class members full restitution of all benefits wrongfully acquired by Defendant by means of the wrongful conduct alleged herein; and (vi) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendants;

c) For a preliminary and permanent injunction restraining Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them from:

   (1) transmitting any information about Plaintiffs or class member's activities on any of the Facebook Beacon Activated Affiliates' websites to any other websites, including Facebook;

   (2) transmitting any information about Plaintiffs or class member's activities on any of the Facebook Beacon Activated Affiliates' websites to any other websites, including Facebook without fair, clear and

conspicuous notice of the intent to transmit information, including a full description of all information for transmission;

(3) transmitting any information about Plaintiffs or class member's activities on any of the Facebook Beacon Activated Affiliates' websites to any other websites, including Facebook without fair, clear and conspicuous opportunity to decline the transmittal prior to any transmission of data or information;

d)   Awarding damages, including statutory damages where applicable, to the Class in an amount to be determined at trial (for purposes of clarity, no damages are sought at present with respect to Plaintiffs' claims brought pursuant to the CLRA);

e)   Awarding Plaintiffs reasonable attorney's fees and costs;

f)   Awarding pre- and post-judgment interest; and

g)   Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

The Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

DATED this 12th day of August, 2008.

By:   Alan Himmelfarb

1

2   Alan Himmelfarb
    KamberEdelson, LLC
3   2757 Leonis Blvd
    Vernon, California 90058-2304
4   Telephone: (323) 585-8696
5   ahimmelfarb@kamberedelson.com

6   Scott A. Kamber
    KamberEdelson, LLC
7   11 Broadway, 22nd Floor.
    New York, NY. 10004
8   Telephone: (212) 920-3072
    Fax: (212) 202-6364
9   skamber@kamberedelson.com

10  Joseph H. Malley
    Law Office of Joseph H. Malley
11  1045 North Zang Boulevard
    Dallas, Texas 75208
12  Ph. (214) 943-6100
    Fax (214) 943-6170
13  malleylaw@gmail.com
    *(Pro Hac Vice Pending)*

14  *Counsel for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28